UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

JAVON GAMBLE,

                          Petitioner,

                -against-

MICHAEL KIRKPATRICK,

                          Respondent.

-----------------------------------------------------------X

**FILED**
**CLERK**
For Online Publication Only
5/26/2023 1:08 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM AND ORDER**
17-CV-05294 (JMA)

**AZRACK, United States District Judge:**

Petitioner Javon Gamble ("Gamble" or "Petitioner"), proceeding pro se, petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. In March 2013, Gamble was convicted, after trial, of three counts of robbery in the first degree, three counts of robbery in the second degree, one count of grand larceny in the second degree, and one count of possession of burglar's tools. He is presently serving a determinate sentence of twenty-five years imprisonment followed by five years of post-release supervision. Gamble seeks habeas relief on the grounds that he was provided ineffective assistance of appellate counsel when his appellate counsel failed to cite trial counsel for ineffective assistance on multiple grounds. Gamble also contends that appellate counsel erroneously advise him to raise ineffective assistance of trial counsel claims—which he pursued pro se—in a § 440.10 motion rather than on direct appeal. Gamble also contends that the cumulative effect of appellate counsel's errors constituted ineffective assistance.

For the following reasons, Gamble's petition is DENIED in its entirety.

# I. BACKGROUND

## A. Factual Background

The evidence at trial showed the following.

On October 14, 2011, four individuals entered the London Jewelers store located at 2046 Northern Boulevard in Manhasset, New York (the "London Jewelers") and announced a robbery. (Trial Transcript ("Trial Tr.") 283–85, 322–23 II"), ECF No. 8-45, 84:20–24, 85:17–18, 123:13–16.) They were wearing ski masks and wielding handguns. (Tr. 283–84, 312–317, 361, 373, 489.) The robbers used a sledgehammer to destroy glass display cases in the store and stole luxury watches worth over $800,000. (Tr. 308, 315, 362, 488.) The robbery was captured on the store's video cameras. (Tr. 282–899, 304–310.) The robbery happened quickly—the robbers fled the store within two minutes. (Tr. 362, 371.) During the robbery, one of the perpetrators also stole a walkie talkie from Wilson Cosme, the Director of Security at London Jewelers. (Tr. 282.) Witness testimony and the store video indicated that some of the robbers were wearing blue painter's suits while one of the robbers was wearing a sweatshirt jacket that had a distinctive diamond quilt pattern and red emblem. (See Tr. 311 (robbers wore "blue coveralls"); Tr. 403–04 (sweatshirt); Tr. 490 (robbers wore "[b]lue jumpsuits, insulation suits").)

After they left London Jewelers, the robbers jumped into their getaway vehicle, a black Cadillac Escalade. (Tr. 323, 331, 339–40.) Video from the store showed indicated that a fifth person was involved in the robbery as four perpetrators were in the store and an additional person drove the getaway vehicle. (Tr. 746.)

A security guard reported to 911 that the robbers were fleeing in a black Escalade. (Tr. 323–331, 339–40.) Shortly thereafter, a police officer in a nearby patrol car received a radio call about the robbery and drove to London Jewelers. (Tr. 518.) The security guard pointed out the

fleeing Escalade to the officer, who began to pursue the Escalade.  (Tr. 518, 519.)  The Escalade attempted to evade police officers on Northern Boulevard.  (Tr. 323–331, 339–41.)  While traveling on the wrong side of Northern Boulevard, the Escalade collided with a police vehicle and continued to lead police on a pursuit that reached speeds of approximately 100 miles per hour on Community Drive.  (Tr. 341.)  The pursuit continued onto the Long Island Expressway ("LIE"), where police officers set up a roadblock.  (Tr. 344, 383. 400, 442.)

At this point, with traffic coming to a standstill and the roadblock ahead of them, four robbers jumped out of the still-moving Escalade, ran across the LIE and climbed over fences separating the LIE from the Lake Success Country Club golf course.  (Id. at 185:24–86:2, 187:1–6, Tr. 344. 384–87.)

Multiple officers involved in the pursuit observed the suspects fleeing the vehicle and testified that one of the suspects was wearing blue clothing.[1]  (Tr. 384–86, 406–409 (testimony of Officer Cancel that one suspect was wearing blue clothing and a white shirt); Tr. 442, 456 (testimony of Officer Alter that one suspect was in "all blue").)

After Officer John Cancel saw the suspects scale the fences, he was picked up by Officer Thomas Alter in a patrol car.  (Tr. 387–388.)  The officers then drove onto the golf course where they eventually encountered the same individual wearing blue clothing and a white shirt that Officer Cancel had seen scale the fences.  (Tr. 388, 411–12 (testimony of Cancel that the suspect was now wearing the blue jacket around his waist); Tr. 444 (testimony of Alter)).  This individual was defendant Gamble.  (Tr. 388.)  Gamble was placed under arrest.  (Tr. 388.)  When Officer Alter patted down Gamble, he found one of the gold Rolexes that had been stolen from London

---

[1] Defense counsel tried to impeach this testimony at trial by, inter alia, pointing out that, in a radio call, Officer Cancel did not mention the suspect who was wearing blue and instead only mentioned the other suspect he was pursuing, who was wearing all black and carrying a duffle bag.  (Tr. 412–13.)

Jewelers in Gamble's pants cuff.  (Tr. 447–48, 465 (testimony of Alter); Tr. 700–01 (testimony of Officer Terence Mitchell).)  When he was arrested, Gamble was wearing two pairs of pants— "painter's paints" on top of a pair of jeans.  (Tr. 403, 448.)  The stolen watch was worth $48,900. (Tr. 365–66.)

The clothing Gamble was wearing at the time of his arrest was introduced into evidence. (Tr. 402, 449.)  The sweatshirt jacket Gamble was wearing had a distinctive diamond-shaped pattern and red emblem on it.  (Tr. 403.)  As noted above, the video of the robbery showed one of the robbers was wearing the same distinctive sweatshirt jacket.  (Tr. 403–04.)

Three other suspects—Leroy Nelson, Samuel Cephas, and Reginald Fowler—were also arrested on or around the golf course.  (Tr. 390, 477–79, 520.)  Cephas was found hiding in a swamp on the golf course.  (Tr. 520.)  The Escalade that the suspects abandoned on the LIE was registered to Cephas's sister.  (Tr. 746.)

The next day, police found a duffle bag containing the remaining stolen watches in a garage adjacent to the Lake Success Country Club golf course.  (Tr. 497–501, 568–69.)  An owner of the house—who reported the duffle bag to the police upon discovering it—testified at trial.  (Tr. 497–501.)

Gamble's DNA was found on:  (1) a ski mask that was recovered fifty feet behind the Escalade on the LIE; (2) a knit cap and a sledgehammer recovered from inside the Escalade; and (3) multiple locations inside the Escalade where blood was located.  (Tr. 684, 687, 689.)

As discussed infra, on the day of the robbery, October 14, police officers on the scene took photographs of the interior of the Escalade before the vehicle was removed from the LIE and impounded.  The Escalade was subsequently searched, pursuant to a search warrant, on October 17 at the impound lot.  Immediately before this search was conducted, additional photographs of

4

the Escalade were taken.  Discrepancies between these two sets of photographs indicated that unidentified officers had searched the vehicle in the interim and had handled certain evidence found in the Escalade.  The photos appeared to indicate that clothing inside the Escalade had been moved around and that, in the second set of photos, a red rubber handle was now on the sledgehammer.  The only witness called by the defense was Detective John Fitzgerald—the lead detective on the case—who testified about the search of the Escalade and was questioned about the photos that were taken on both October 14 and October 17.

## B.  Procedural Background

### 1.  Trial, Conviction, and Sentencing

Gamble was tried in New York Supreme Court, Nassau County.  Prior to trial, the court held a Huntley-Mapp-Dunaway suppression hearing and determined, inter alia, that:  (1) the police had reasonable suspicion to stop the Escalade based on radio notifications and personal observations; (2) the police had probable cause to arrest; and (3) the Rolex found in Gamble's pant cuff was discovered during a lawful search incident to Gamble's arrest.  (Suppression Hr'g Decision and Order, ECF No. 8-43, 8–10.)

Gamble was tried in February and March of 2013.  Defense counsel argued that the police planted Gamble's blood and DNA on the incriminating evidence introduced at trial and asserted, based on purported inconsistencies in the prosecution's evidence, that the police did not recover the incriminating watch and sweatshirt jacket from Gamble.  (Tr. 757–64, 769–70.)  Defense counsel's summation also highlighted issues with the search of the Escalade.  (Tr. 754, 769.)  Given the evidence at trial, defense counsel was unable to offer any convincing explanation for why Gamble was on the golf course shortly after the suspects fled the Escalade.  (Tr. 770; see also Tr. 280.)

On March 13, 2013, a jury convicted Gamble of three counts of Robbery in the First Degree, (N.Y. Penal Law § 160.15(2)); three counts of Robbery in the Second Degree, (N.Y. Penal Law § 160.10(1)); one count of Grand Larceny in the Second Degree, (N.Y. Penal Law § 155.40); and one count of Possession of Burglar's Tools, (N.Y. Penal Law § 140.35).  (Tr. 865–868.)

At his sentencing hearing, Gamble moved pro se to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30.  (Sentencing Tr. 2–10, ECF No. 8-49.)  Gamble argued, inter alia, that the items recovered from the Cadillac Escalade should have been suppressed. (See Notice of Mot. to Set Aside the Verdict, ECF No. 8-50.)  At the sentencing hearing, trial counsel adopted the motion, which the court denied at sentencing.  (Sentencing Tr. 10.)

Gamble was sentenced—as a second violent felony offender—to twenty-five (25) years imprisonment and five (5) years of post-release supervision for each of the three counts of robbery in the first degree; fifteen (15) years imprisonment and five (5) years of supervised release for each of the three counts of robbery in the second degree; an indeterminate sentence ranging from seven (7) to fifteen (15) years for one count of grand larceny; an indeterminate sentence ranging from three-and-a-half (3.5) years to seven (7) years for one count of criminal mischief; and one (1) year imprisonment for possession of burglar's tools.  (Tr. 14–17.) Each sentence was ordered to run concurrently.  (Tr. 17.)

## 2.  Direct Appeal

On August 22, 2014, Gamble's appellate counsel filed a brief with the Appellate Division, Second Department, arguing that:  (1) the trial court erred in denying Gamble's Batson challenge; (2) Gamble's shackling during the suppression hearing and his absence during a court colloquy about the use of restraints violated his rights; (3) the trial court erred in instructing the jury concerning an affirmative defense to the first degree robbery charge because there was no evidence

that the firearms were loaded with ammunition that could be discharged; (4) the trial court erred in denying suppression of a statement made by Gamble, which was ultimately not used by the prosecution at trial[2]; and (5) Gamble's sentence was excessive.

Gamble also filed a <u>pro se</u> supplemental appellate brief on June 1, 2015.  (<u>See</u> Appellant's Supp. Br., ECF No. 8-2.)  In his pro se brief, Gamble argued, <u>inter alia</u>, that: (1) any inventory search of the Escalade was invalid and the suppression hearing should have been reopened after Detective Fitzgerald's testimony; (2) his convictions were against the weight of the evidence; and (3) the prosecution committed prosecutorial misconduct by improperly vouching for the credibility of witnesses, becoming an unsworn witness, and using false testimony to obtain Gamble's conviction.

On March 16, 2016, the Appellate Division affirmed Gamble's conviction and denied his appeal in its entirety.  <u>See People v. Gamble</u>, 137 A.D.3d 1053, 1054, 27 N.Y.S.3d 226, 226 (App. Div. 2d Dep't 2016).  With respect to Gamble's argument that the suppression hearing should have been reopened based on the testimony of Detective Fitzgerald, the Appellate Division held that this argument was not preserved because, during trial, Gamble did not seek to reopen the suppression hearing after Detective Fitzgerald's testimony.  On June 1, 2016, the New York Court of Appeals denied leave to appeal.  <u>See People v. Gamble</u>, 27 N.Y.3d 1132, 61 N.E.3d 513, 39 N.Y.S.3d 114 (2016).

---

[2] Defense counsel asked the Appellate Division to review this suppression ruling in the event of a reversal so that the defense could adequately prepare for a retrial.

### 3.  Section 440 Motion

In August 2014[3]—before Gamble's counseled and <u>pro</u> <u>se</u> appellate briefs had been filed—Gamble filed a <u>pro</u> <u>se</u> motion to vacate the judgement of conviction pursuant to New York Criminal Procedure Law § 440.10(1).  (<u>See</u> Mot. to Vacate Judgment of Conviction ("440 Motion"), ECF No. 8-10.)  Gamble argued, <u>inter</u> <u>alia</u>, that:

- Trial counsel was ineffective because he failed to: (i) object to prejudicial evidence and use records to establish that Gamble was, in fact, not in possession of the stolen watch or the sweatshirt jacket when he was arrested; (ii) object to the admission of the evidence recovered from the inside the Escalade, which was purportedly tampered with and fabricated; and (iii) request a missing witness charge concerning the unidentified officers who searched the Escalade.  (<u>Id.</u> at 14–26); and

- the prosecutor violated introduced false evidence and committing a <u>Brady</u> violation concerning evidence about the search of the Escalade and the evidence found inside, which was allegedly tampered with and fabricated.

(<u>Id.</u> at 27–37.)

On September 24, 2014, the court denied Gamble's 440 motion in its entirety, on both procedural grounds and on the merits.  (440.10 Decision ("440 Decision"), ECF No. 8-11.)  The court reasoned that because Gamble failed to demonstrate the existence of pertinent evidence extraneous to the record, Gamble had to raise these issues on appeal rather than through collateral review.  Additionally, the court also found, on the merits, that Gamble "failed to proffer evidence that [his] conviction was obtained in violation of his constitutional rights."  (<u>Id.</u> at 2.)  The Appellate Division subsequently denied Gamble's application for leave to appeal the denial of his 440 Motion.

### 4.  The Coram Nobis Petition

On December 4, 2016, Gamble moved for a writ of error coram nobis, asserting that he

---

[3] Gamble's Notice of Motion indicates that the document was notarized on July 1, 2014, but the notary stamp is dated August 10, 2014.

received ineffective assistance of appellate counsel.  (See Coram Nobis Pet., ECF No. 8-15.) Specifically, Gamble argued that appellate counsel should have argued, on direct appeal, that trial counsel provided ineffective assistance when he counsel failed to:

- challenge the admission of the evidence recovered from the Escalade by:  (i) renewing his motion to re-open the suppression hearing after Detective Fitzgerald's testimony; (ii) objecting to the admissibility of this evidence based on a break in the chain of custody; and (iii) charging the prosecution with a Brady violation for withholding exculpatory evidence concerning the search of the vehicle and tampering of the evidence therein;

- object to the identification testimony of witnesses who were not identified in the prosecution's N.Y. CPL § 710.30 notice; and

- object to the presence of unsworn jurors and the testimony of an unsworn prosecution witness.

(Id. at 16, 21, 29–30.) Gamble also argued that the cumulative effect of appellate counsel's failures constituted ineffective assistance of appellate counsel.  (Id. at 31, 33.)

The Appellate Division denied the coram nobis petition, finding, without any further explanation, that Gamble "failed to establish that he was denied the effective assistance of appellate counsel."  People v. Gamble, 150 A.D.3d 1147, 52 N.Y.S.3d 667 (App. Div. 2d Dep't 2017).  On August 4, 2017, the New York Court of Appeals denied leave to appeal.  See People v. Gamble, 29 N.Y.3d 1127, 86 N.E.3d 569, 64 N.Y.S.3d 677 (2017).

### 5.  The Instant Petition

Gamble filed the instant habeas petition in September 2017, claiming ineffective assistance of appellate counsel.  (See Petition, ECF No. 1.)  Gamble seeks relief on essentially the same grounds that he raised in his coram nobis petition.  He contends that appellate counsel should have argued, on his direct appeal, that trial counsel was ineffective for not:

(1) challenging the admission of the evidence from Escalade and raising a Brady claim concerning this evidence;

(2) objecting to the identification testimony of witnesses who were not identified in the prosecution's § 710.30 notice; and

(3) objecting to the presence of unsworn jurors and the testimony of an unsworn prosecution witness.

Gamble also asserts that appellate counsel was ineffective for incorrectly advising Gamble to submit ineffective assistance of trial counsel claims in his a § 440.10(1) motion rather than on direct appeal. (Id. at 6.) Gamble further argues that the cumulative effect of appellate counsel's errors merits reversal of his conviction. (Id. at 7.)

As explained below, Gamble's ineffective assistance of appellate counsel claims are meritless.

## II.  DISCUSSION

### A.  Standards of Review

#### 1.  Overview of AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a district court will "entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To make that showing, the petitioner must exhaust his state remedies and satisfy AEDPA's deferential review of state court decisions. See 28 U.S.C. § 2254.

#### 2.  Exhaustion

As a threshold matter, a district court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion

requirement is designed to provide state courts with the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)).  Therefore, a petitioner must show that he fairly presented his federal claim to the highest state court from which a decision can be rendered.  Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc).  Although a petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts of the claim's federal nature.'" Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014) (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).  The petitioner must have informed the state court of "both the factual and legal premises of the claim he asserts in federal court."  Id. at 191.  Even if a petitioner does not explicitly cite the Constitution, he may still "fairly present" constitutional claims to the state courts through:

> (a) reliance on pertinent federal cases employing constitutional analysis,
>
> (b) reliance on state cases employing constitutional analysis in like fact situations,
>
> (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and
>
> (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.  However, "a general appeal" to broad constitutional guarantees fails to present the substance of the claim to the state court.  See, e.g., Gray v. Netherland, 518 U.S. 152, 163 (1996) (holding that a general appeal to a "broad federal due process right" was insufficient to meet the exhaustion requirement without a "more particular analysis" of the specific claim based on the relevant constitutional law).

Where a petition is a "mixed petition," containing both exhausted and unexhausted claims,

the Court may deny the petition on the merits where the claims are clearly meritless.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Ortiz v. Marshall, No. 08-CV-8815, 2009 WL 3170300, at *7 (S.D.N.Y. Sept. 30, 2009) ("Federal courts retain the discretion to deny a petition including unexhausted claims on the merits when it deems those claims to be 'patently frivolous.'").

### 3.  AEDPA Standard of Review

Where a claim is both exhausted and not subject to a procedural bar, a federal court may review the merits of the state court decision on that issue, subject to the deferential standard set out by AEDPA.  Under that standard, a federal court may grant a writ of habeas corpus only where the state court's adjudication of the claim either:

> [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"  Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams, 529 U.S. at 412) (alteration in original).  The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).  A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412–13 (O'Connor, J., concurring).  A decision

involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413.  This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam)).  This standard is "difficult to meet." White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Metrish v. Lancaster, 569 U.S. 351, 358 (2013)), reh'g denied, 573 U.S. 927 (2014).  A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrison v. Richter, 562 U.S. 86, 103 (2011).

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006).  A state court's finding of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).

Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal

constitutional right has been violated." <u>Williams</u>, 529 U.S. at 389.  "When conducting its review under § 2254(d), the federal court is generally confined to the record before the state court that adjudicated the claim." <u>Jackson v. Conway</u>, 763 F.3d 115, 132 (2d Cir. 2014) (citing <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011).

Finally, "if the federal claim was not adjudicated on the merits, AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed <u>de novo</u>." <u>Dolphy v. Mantello</u>, 552 F.3d 236, 238 (2d Cir. 2009) (internal quotation marks and citation omitted).

### 4.  <u>Pro Se</u> Status

In light of Gamble's <u>pro se</u> status, the Court will construe his submissions liberally and interpret them "to raise the strongest arguments that they suggest." <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).  However, <u>pro se</u> status "does not exempt a party from compliance with relevant rules of procedural and substantive law." <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983) (quoting <u>Birl v. Estelle</u>, 660 F.2d 592, 593 (5th Cir. 1981)).

## B.  <u>Standard for Ineffective Assistance of Trial and Appellate Counsel</u>

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his trial counsel's performance was so inadequate that his Sixth Amendment right to counsel was violated.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 689–90 (1984).  Therefore, a petitioner must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms,' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 688, 693).  First, it must be demonstrated that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment.'" Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 687).  Next, a petitioner must show that he was prejudiced by said deficient performance, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. (quoting (quoting Strickland, 466 U.S. at 694).

"[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' Murray v. Carrier, 477 U.S. 478, 496 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Harrington v. Richter, 562 U.S. 86, 111 (2011)

Under AEDPA, federal courts must grant state courts substantial "deference and latitude" when considering claims for ineffective assistance of counsel already rejected at the state court level.  Richter, 562 U.S. at 101.  The Supreme Court has explained that state court determinations of ineffective assistance of counsel are subject to "doubly deferential" review under AEDPA.  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5–6 (2003)).

Although the Strickland test was formulated in the context of a claim of ineffective assistance of trial counsel, the same test generally applies to an ineffective assistance of appellate counsel claim.  Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992).  To provide reasonable professional assistance on appeal, appellate counsel does not have a duty to argue every nonfrivolous issue that could be raised.  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)). "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Id. at 533.

Given this highly deferential standard of review, Petitioner's alleged errors by appellate counsel do not constitute ineffective assistance.   Petitioner's claims fail on both prongs of Strickland.

## C.  Alleged Ineffective Assistance Concerning Challenges to the Evidence Recovered from the Escalade

Petitioner asserts three claims of ineffective assistance of appellate counsel related to the admissibility and legality of evidence recovered from the Cadillac Escalade getaway car.

The following items were recovered from the Escalade during a search on October 17: several blue painter suits; three ski masks; a black knit hat; a black sweatshirt; gloves; a Casio watch; a sledgehammer with a red rubber grip; the floor in the rear of the vehicle; a cell phone from the center console; and a walkie-talkie from the front passenger seat.  (Tr. 608–619, 625, 629.)  Detective Bunster also recovered blood and DNA from the interior of the Escalade.  (Tr. 615–622.)  Gamble's DNA was found on a knit hat, the sledgehammer, and on various areas of the interior of the Escalade where blood was located.  (Tr. 684, 687, 689.)

According to Gamble, trial counsel should have:  (1) sought to suppress this evidence because the police conducted a purportedly unlawful search; (2) challenged its admissibility on chain of custody grounds; and (3) charged the prosecution with a Brady violation concerning evidence about the search of the Escalade.  Accordingly, Gamble contends that appellate counsel was ineffective for not arguing, on his direct appeal, that trial counsel was ineffective for failing to pursue these issues at trial.

Before addressing Gamble's claims about this evidence, a summary of the relevant evidence and procedural history from trial is helpful.

1.   **Evidence and Arguments Presented at Trial Concerning the Search of the Escalade**

The evidence at trial showed that, following the robbery of London Jewelers, the robbers engaged police in a high-speed pursuit in a black Cadillac Escalade.  This pursuit ended when the robbers jumped out of the still-moving Escalade on the Long Island Expressway.  Officers Alter and Fernandez then jumped into the Escalade and put it in park.  (Tr. 442–43.)  During this sequence, Officer Alter—who testified at trial—quickly checked inside the vehicle and did not see anyone.  (Tr. 443.)  Officer Alter then got back into his patrol vehicle, picked up Officer Cancel—who had attempted to pursue the suspects on foot—and drove to the golf course where the suspects had fled.  (Tr. 443–44.)  At trial, Officer Alter did not recall seeing any jumpsuits, masks, blood, or any other items of note, during his quick search of the Escalade.  (Tr. 458–59.)  Another officer on the scene, Joseph Altieri, also testified that he did not see any blood inside the Escalade.  (Tr. 538.)

Shortly thereafter, Detectives Todd Cronin and Ken Mazzie arrived at the scene and photographed the exterior and interior of the Escalade.  (Trial Tr. 554, 573.)  Detective Cronin testified at trial and those photographs were entered into evidence.  (Tr. 551, 554.)

Detectives Cronin and Mazzie found a black ski mask fifty feet behind the Escalade.  (Tr. at 553.)  They photographed the ski mask and then collected it, placing it in a sealed bag, which Detective Mazzie signed and dated.  (Tr. 553, 557–59.)  Subsequent testing showed that Gamble's DNA was on the ski mask.  (Tr. 684, 687.)

The photographs taken by Cronin and Mazzie showed, among other things, a blue jumpsuit hanging out of the front driver's side door.  (Tr. 554–55.)

Cronin testified that he did not notice a walkie talkie in the vehicle.  (Tr. 575.)  Cronin also testified that he did not see any blood in the Escalade.  (Tr. 571.)  Cronin, however, explained that

he was not there to process the vehicle for blood or fingerprints as "further processing" would take place after the vehicle was taken off the LIE and brought to an impound lot.  (Tr. 571–72, 581.) Cronin also explained that because the vehicle was going to be sent for further processing, it was not his intent to "go inside and search the car." (Tr. 578.)  According to Cronin, he was not "really looking necessarily for anything" and was there simply to take photographs and document what the scene "looked like." (Tr. 579.)

When Cronin and Mazzie finished taking photographs and left the scene, the Escalade was still on the LIE.  (Tr. 561, 574–75.)  According to Cronin, the Escalade was secured by members of the police emergency services unit, who subsequently brought the Escalade to the impound. (Id.)

On October 17, 2011, Detective Brian Bunster conducted a search of the Escalade pursuant to a search warrant.  (Tr. 605.)  Before searching the Escalade and removing any items, Detective Bunster photographed the interior of the vehicle.  (Tr. 605.)  One of Bunster's photographs showed several blue painter suits piled on the rear seats.  (Tr. 608.)  Underneath those painter suits, Bunster discovered additional clothing—including three ski masks, a black hat, and gloves—which he also photographed.  (Tr. 612–13.)  Bunster testified that he did not put the clothes on the seat and did not know who put the pile of clothes there.  (Tr. 639.)

Another photograph taken by Bunster showed a walkie-talkie on the front passenger seat.[4] (Tr. 610.)  Bunster also took a picture of a sledgehammer that was on the floor between two rear bucket seats.  (Tr. 614.)  Bunster's photograph apparently showed that there was a red grip on the handle of the sledgehammer.  (Tr. 614, 629.)  As discussed infra, it appears that a photograph taken

---

[4]  The photographs taken by Cronin and Mazzie on October 14 apparently did not show a walkie talkie on the front seat.  (See Petr's Aff. in Supp. of Pet. for Writ of Coram Nobis ("Petr.'s Coram Nobis Aff.") at 10; Petitioner's Reply Br. at 14–15, ECF No. 12.)

by Detectives Cronin and Mazzie on October 14 showed that the red grip was not attached to the sledgehammer.  (Tr. 743.)

Detective Bunster also searched the vehicle "very slowly" and "very methodically" for blood.  (Tr. 616; see Tr.615–624.)  He was able to find blood in six places inside the vehicle. (Tr. 617.)  Bunster photographed and recovered blood from these areas of the vehicle.  (Tr. 615–16.)

In addition to the DNA found on the ski mask, Gamble's DNA was also found on a knit cap and the sledgehammer recovered from the Escalade as well as from the six areas of Escalade's interior where blood was located.  (Tr. 684, 687, 689.)  DNA from two other defendants—Fowler and Nelson—was found on other items recovered from the Escalade.  Fowler's DNA was found on a glove and a ski mask and Nelson's DNA was found on a ski mask.  (Tr. 691–92.)  Fowler's DNA was also found at London Jewelers.  (Tr. 691–92.)  At trial, defense counsel stressed that various items—including the sweatshirt jacket and watch found on Gamble—were not forensically tested and that Gamble's blood, DNA, and fingerprints were not found on certain items or areas—including the gloves or at London Jewelers.  (Tr. 717–18, 726.)

At the conclusion of the prosecution's case, defense counsel moved to reopen the suppression hearing in an attempt to suppress the items recovered from the Escalade.[5]  (Tr. 712.) Defense counsel argued that the evidence from the Escalade should be suppressed because it was not recovered pursuant to a valid inventory search of the Escalade.  (Tr. 712–13.)  The prosecutor responded that "there was a search warrant conducted of the vehicle, not an inventory search," and

---

[5] Although Gamble and his three co-defendants had moved to suppress various pieces of evidence prior to trial, the defendants did not move to suppress any of the items recovered from the Escalade on the ground that the officers conducted an unlawful search of the vehicle after Detectives Cronin and Mazzie took photographs of the vehicle on the LIE and before Detective Bunster's October 17 search.

noted that this "was brought up at the [pre-trial suppression] hearing." (Tr. 713.)  The court denied the renewed suppression motion.  (Tr. 713.)

Gamble then presented his defense case.  The only witness called by the defense was Detective John Fitzgerald.  Fitzgerald, the lead detective on the case, had seen the Escalade on the LIE before the arrival of Detectives Cronin and Mazzie and had also been present during Detective Bunster's search of the Escalade on October 17.  (Tr. 714, 742.)  Fitzgerald had not been called by the prosecution.

During Detective Fitzgerald's testimony, the prosecutor showed him the photos of the interior of the Escalade taken by Cronin and Mazzie on the LIE and the photos taken by Detective Bunster on October 17 during the search he conducted pursuant to the search warrant.  (Tr. 741–742–43.)   The prosecutor's questions and Detective Fitzgerald's answers noted certain discrepancies between these photos taken at the scene and the later photos taken by Detective Bunster.  (Tr. 740–43.)  Detective Fitzgerald admitted that "things" in the Escalade "had been moved around."[6]  (Tr. 742.)  Detective Fitzgerald testified that he did not stack the clothing in a

---

[6] Specifically, Detective Fitzgerald gave the following testimony during the prosecutor's cross-examination:

> Prosecutor:  Now, I'm putting up 43, then 44, and then I put up 45 [photos taken by Cronin and Mazzie on October 14].

> The Court:  Okay.

> Prosecutor:  I took them off.

> Q:  Now, detective, were you present when Detective Bunster performed the search warrant on the Escalade a few days later?

> A: Yes.

> ****

> Q:  I will show you what was introduced as People's 72, 74 and 89 [pictures taken by Bunster on October 17].  Before you are shown that, detective, were the contents of the black Escalade the same at the scene as they were at the search warrant? Had things been moved around?

> A:  Yes.

pile on the rear seat and that he did not know who did.  (Tr. 743.)

Detective Fitzgerald was also asked about a discrepancy in the photos concerning the sledgehammer during the following exchange:

> Q:  [In] People's 74 [a photograph taken by Detective Bunster on October 17], the red handed sledgehammer is now between the seats, correct?
>
> A:  Yes.
>
> ****
>
> Q:  Now, this is People's 44 [a photograph taken by Cronin and Mazzie on October 14]. There is a sledgehammer, and there happens to be a red handle not on the sledgehammer, correct?
>
> A:  Correct.

(Tr. 743.)

In the photograph of the sledgehammer taken by Cronin and Mazzie on October 14, the sledgehammer is apparently located behind the passenger seat and does not have a rubber grip on it.  (Petitioner's 2254 Reply Br. at 14–15, ECF No. 12.)  By contrast, in the October 17 photograph taken by Detective Bunster, the sledgehammer is apparently located between the rear bucket seats and now has a red rubber grip.  (Id.)

The questions about the search and photographs—which were asked by the prosecutor—appear to have been an effort by the prosecution to preempt arguments that the prosecution expected defense counsel to make about these discrepancies during summation.

During the defense summation, defense counsel highlighted Detective Fitzgerald's

---

Q:  They had been moved around?

A:  Yes.

(Tr. 742.)

testimony and issues with the evidence recovered from the Escalade, arguing that "he doesn't know who was in that Escalade between October 14th and October 17th, who moved everything around, who had access to it." (Tr. 754; see also Tr. 769 ("We don't know what happened with the hammer").)  Defense counsel also argued that the police planted Gamble's blood and DNA in the Escalade and on the other incriminating evidence by using a bloody shirt that Gamble took off during his police interrogation, a water cup that he drank from during the interrogation, and Gamble's vomit, as he had vomited several times while in custody. (Tr. 769–70.)  Defense counsel contended that Gamble was framed by the police for this crime and suggested—based on purported inconsistencies in the testimony and other evidence elicited during trial—that the police did not actually recover the stolen watch from Gamble or the blue sweatshirt jacket, as they had testified. (Tr. 757–64; see also Tr. 354, 373, 407–431, 452–68, 506–511, 526–27, 700–02, 714–19, 726–28, 741–43.)

Given the evidence at trial, defense counsel was unable to offer any coherent explanation for why Gamble was on the golf course.  Instead, defense counsel was left to offer speculative theories in a futile attempt to explain Gamble's undisputed presence.  (See Tr. 770–71 ("There could be many reasons Javon was on that golf course.  He could have been taking a walk.  He could have been looking for a job at the clubhouse. . . . I submit to you [the police] grabbed Javon Gamble because he happened to be the first black man they saw"); see also Tr. 280 (arguing, in his opening statement, that Gamble "was only arrested because he was in the wrong place at the wrong time"),

In summation, the prosecution addressed the discrepancies between the two sets of photographs as follows:

Now, there is no question -- there is no question that certain items in the car were moved. That was brought up today through Detective Fitzgerald, that there were photographs that the blue suit were moved, the ax handle, the sledge hammer, the handle was moved, it was moved in the car. There's no question about that.

You have to ask yourself this question: If the cops are looking for a gun, if the cops are looking for a revolver, if they know that guns have been used, they're going to look in that car. They're going to toss that car and try to find that gun. Sure, things are going to move around that car. Certainly, it is not a conspiracy. It is certainly not something that raises not to the level of framing an innocent man. That's a big step. That's a big step you have to take based on the evidence you heard, based on the witnesses you saw.

(Tr. 784.) During summation, the prosecution stressed that the watch found on Gamble is "all you need" to convict. (Tr. 786.) The prosecutor also stressed to the jury that the mask with Gamble's DNA was found behind the Escalade. (Tr. 848–852.)

### 2.    Analysis of Plaintiff's Ineffective Assistance of Appellate Counsel Claims Concerning the Evidence Recovered from the Escalade

Based on the trial evidence set forth above, Plaintiff argues that appellate counsel was ineffective for not arguing, on direct appeal, that trial counsel was ineffective for failing to advance the following arguments and claims at trial:

- trial counsel should have sought to reopen the suppression hearing based on Detective Fitzgerald's testimony and argued that all of the evidence recovered from the Escalade should have been suppressed because unidentified officers conducted an unlawful search of the Escalade at some point after the photographs taken by Officers Cronin and Mazzie and before the photographs taken by Detective Bunster;

- trial counsel should have objected to the admission of the evidence recovered from the Escalade on the grounds that the chain of custody was broken and that the police "manufactured and changed the condition of the evidence"; and

- trial counsel should have argued that the prosecution violated Brady v. Maryland by failing to disclose exculpatory evidence—namely, the fact that unidentified officers entered the vehicles and that the condition of the evidence changed prior to the execution of the search warrant by Detective Bunster.

None of these arguments are meritorious. Gamble cannot establish that trial counsel acted unreasonably or that there is a reasonable probability that these arguments would have resulted in

suppression of the evidence found in the Escalade.  And, even assuming <u>arguendo</u> that these arguments might have resulted in the suppression of some or all of the evidence from the Escalade, there was other overwhelming evidence of Gamble's guilt.  As such, Gamble cannot show prejudice.

First, Gamble cannot show that trial counsel acted unreasonably or that he was prejudiced by trial counsel's decisions concerning suppression of the evidence.  Any motion to suppress the evidence recovered from the Escalade—whether made pre-trial or after Detective Fitzgerald's testimony—would have failed because Gamble did not have standing to challenge the search of the Escalade.  The occupants of the Escalade jumped out of the vehicle while it was still moving and abandoned it on the LIE with the doors open.  As such, Gamble and the other occupants lacked standing to challenge the search of the Escalade and any suppression motion would have failed. <u>See</u> <u>People v. Ethridge</u>, 175 A.D.3d 552, 104 N.Y.S.3d 915 (App. Div. 2d Dep't 2019) (finding that defendant lacked standing to challenge search of vehicle where the defendant "abandoned the vehicle when, after crashing it into several parked cars, he fled from the scene of the accident, leaving the driver's side door open and the keys in the ignition"); <u>see</u> <u>also</u> <u>People v. Brunson</u>, 145 A.D.3d 1476, 1477, 44 N.Y.S.3d 643 (App. Div. 4th Dep't 2016) ("[D]efendant's unprovoked flight from the vehicle constituted an abandonment of the vehicle and a waiver of any claim to a reasonable expectation of privacy therein thereby undermining any claim he may have had to an expectation of privacy in the vehicle or its contents."); <u>People v. Hanks</u>, 275 A.D.2d 1008, 714 N.Y.S.2d 168 (App. Div. 4th Dep't 2000) (holding that defendant lacked standing to challenge search where he "attempted to evade the police and fled on foot after leaving the car on a dead-

end street  . . . with the radio on and the keys in the ignition").[7]

Second, as for the chain of custody issue, Gamble cannot show that trial counsel acted unreasonably or that Gamble was prejudiced because the chain of custody objections to the evidence recovered from the Escalade would have failed.

Under New York law,

A party seeking to introduce a fungible item of real evidence must show that the evidence offered is identical to that involved in the crime, and has not been tampered with. Proof of a complete chain of custody is one accepted technique for showing the authenticity of a fungible item of real evidence, and generally requires that all those who have handled the item identify it and testify to its custody and unchanged condition.  However, failure to establish the chain of custody of such an item may be excused where the circumstances provide reasonable assurances of the identity and unchanged condition of the evidence.  In these circumstances, gaps in the chain of custody go to the weight of the evidence, not its admissibility.

People v. Davidson, 111 A.D.3d 848, 848–49, 975 N.Y.S.2d 128, 129 (App. Div. 2d Dep't 2013) (citations and internal marks omitted).  Here, objections based on the prosecution's failure to establish an unbroken chain of custody would not have resulted in exclusion of the items seized from the Escalade and, instead, would have simply gone to the weight of the evidence.  At trial, defense counsel advanced skillful arguments about the weight to be accorded to the evidence seized from the Escalade—those arguments were obviously rejected by the jury.

Even assuming, for the sake of argument, that trial counsel could have excluded the sledgehammer on chain of custody grounds, Gamble's ineffective assistance claim would still fail. Gamble maintains that the sledgehammer should have been excluded on chain of custody grounds

---

[7] Although Respondent has not advanced Gamble's lack of standing as a reason why suppression would have been denied, this ground is obvious from record in this case.  When, as occurred here, "a state court's decision [denying a federal claim] is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Harrington v. Richter, 562 U.S. 86, 98 (2011).  In such circumstances, a federal habeas court "must determine what arguments . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 86.  Here, Gamble cannot meet either prong of the Strickland analysis because any suppression motion would have failed given Gamble's patent lack of standing to challenge the lawfulness of the search.

because a photo taken by Detective Cronin on October 14 apparently showed the sledgehammer without a rubber handle whereas a subsequent photo taken by Detective Bunster on October 17 apparently showed a rubber handle on the sledgehammer. However, even if the sledgehammer itself had been excluded, the prosecution still could have admitted the photograph that Detective Cronin took of the sledgehammer inside the Escalade before it was impounded. There was also video and testimonial evidence establishing that the robbers used the sledgehammer.

Moreover, even assuming arguendo that defense counsel could have succeeded in excluding the sledgehammer, objections to the other evidence seized from the Escalade would not have been successful. The mere fact that certain items had been moved does not suggest that those items were tampered with or that their condition had changed. As for the walkie talkie, Cosme testified that this was his walkie talkie and no DNA evidence was even recovered from it, (Tr. 308–310, 680). See People v. Mendez, 239 A.D.2d 945, 946, 659 N.Y.S.2d 618, 618–19 (App. Div. 4th Dep't 1997) ("Where, as here, the trial testimony provides reasonable assurances that the gun taken from defendant's vehicle was the same item as that introduced at trial, '[d]eficiencies in the chain of custody of property go to the weight rather than the admissibility of that evidence.'" (quoting People v. Caldwell, 221 A.D.2d 972, 972, 634 N.Y.S.2d 331, 332 (App. Div. 4th Dep't 1995))). There was also no basis to exclude the blood and DNA recovered from the interior surfaces of the Escalade. The prosecution offered sufficient proof that this evidence was unchanged to warrant its admission. The photographs in the record did not establish that the condition of the blood found in the Escalade had been changed. While other officers on the scene did not notice any blood when they viewed the Escalade on the LIE, this was easily explained by the circumstances, including that: (1) there were only small amounts blood in the Escalade; (2) Officer Alter only conducted a quick inspection of the vehicle to see if any of the suspects were

inside; (3) Officer Alter, Officer Altieri, and Detective Cronin were not tasked with processing the vehicle for blood; and (4) Detective Bunster only discovered the blood during a very "slow[]" and "methodical[]" examination of the Escalade's interior.  Given this record, any objection to the admission of this blood and DNA evidence from the Escalade's interior would have been overruled.

Third, trial counsel was also not ineffective for failing to assert a Brady claim based on the prosecution's alleged failure to disclose exculpatory evidence.  To demonstrate a violation of his rights under Brady v. Maryland, 373 U.S. 83 (1963), Petitioner had to show that "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001).

All the photographic and testimonial evidence that Gamble relies on in support of this alleged Brady claim was admitted into evidence during trial.  Gamble had ample opportunity to exploit this evidence at trial and the jury considered all this evidence.  Accordingly, any Brady claim would have failed.

Moreover, the record indicates that defense counsel had all the relevant photographs taken by Detectives Cronin, Mazzie, and Bunster in his possession prior to trial.  (See Petitioner's 2254 Reply Br. at 7-9, 16–17, ECF No. 12.)  These photographs showed the very discrepancies that Gamble now highlights.  Detective Fitzgerald's testimony that things "had been moved around" simply admitted what was apparent from the photos.  Any Brady claim based on Fitzgerald's testimony would have failed because, in light of the photographs, Gamble already "knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted).  In any event, Fitzgerald testified at trial and defense counsel stressed the favorable aspects of that testimony in

his summation.  Accordingly, any <u>Brady</u> claim would have failed.

Gamble's ineffective assistance claims also fail because he cannot establish prejudice. Even assuming for the sake of argument that all the evidence recovered from the Escalade would have been suppressed because of an unlawful search or would have been found inadmissible based on a chain of custody argument, there is not a reasonable probability that the outcome of the trial would have been different because the other evidence at trial was overwhelming.[8]  Gamble was arrested on the golf course shortly after the suspects fled the Escalade, and multiple officers testified that he was carrying one of the stolen watches when he was arrested.  Other damning evidence also clearly established Gamble's guilt.  The blue sweatshirt jacket he had on when he was arrested matched the jacket worn by one of the robbers in the surveillance video.  The police also recovered a ski mask fifty feet behind the Escalade that contained Gamble's DNA.  None of Gamble's challenges to the evidence found inside the Escalade would have resulted in the exclusion of the ski mask found behind the Escalade.  Even excluding all the evidence found in the Escalade, the other evidence at trial was still overwhelming.[9]

---

[8] The Court also notes that, given the strength of the other evidence against Gamble, appellate counsel had strategic reasons for pursuing the other arguments he raised in his appellate brief rather than pursuing the ineffective assistance claims discussed above.  Given the overwhelming evidence against Gamble, appellate counsel focused on arguments such as <u>Batson</u> and the shackling of Gamble that, if successful, could have potentially resulted in vacatur of Gamble's convictions irrespective of the strength of the overwhelming evidence that identified Gamble as one of the robbers. <u>See, e.g.</u>, <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 248 (2d Cir. 1998) ("a <u>Batson</u>/<u>Powers</u> claim is a structural error that is not subject to harmless error review").  Relatedly, appellate counsel's argument about alleged instructional error on the first degree robbery charges—which concerned the discrete issue of whether guns used had been loaded—could have resulted in a partial victory on appeal even with the overwhelming evidence that Gamble was one of the robbers.

[9] Even assuming <u>arguendo</u> that trial counsel could have succeeded in suppressing and excluding all the evidence from the Escalade, it is not clear that this would have been a wise strategic decision.  The other damning evidence— including the ski mask and the sweatshirt, and watch found on Gamble—would still have been before the jury.  It would have been a reasonable strategic decision to let the jury hear all the evidence about the searches of the Escalade and the purported tampering with the evidence therein and to use that evidence—as trial counsel did—to try to discredit the prosecution's entire case and to try to establish that the police had tampered with and planted the other incriminating evidence before the jury that was not a product of the search.

There is not a reasonable probability that the jury would have reached a different verdict.[10]

Given all the points above, it cannot be said that the state court's denial of these ineffective

assistance claims was contrary to, or an unreasonable application of, clearly established Supreme

Court precedent, or based on an unreasonable determination of the facts.

### E.  Trial Counsel's Failure to Object to Identification Testimony of Witnesses Not Noticed Pursuant to CPL § 710.30

Petitioner alleges that trial counsel failed to object to the identification testimony of

witnesses whom the prosecution did not identify in its New York Criminal Procedure Law

§ 710.30 notice.  (Pet. at 6.)  Specifically, Petitioner contends that trial counsel should have

objected to the purported identification testimony of police officers Cancel, Alter, and Mitchell at

trial and that counsel's failure to do so amounted to ineffective assistance.  (Id. at 7–8.)  Because

this claim is meritless, appellate counsel was not ineffective for failing to argue ineffective

assistance of trial counsel on appeal.

In New York, the prosecution is required to notify the defendant, prior to trial, of any

identification testimony "regarding an observation of the defendant either at the time or place of

---

[10]  Two of the offenses for which Gamble was convicted were explicitly tied to the walkie talkie and sledgehammer. Count Three charged Gamble with committing first degree robbery in connection with the theft of the walkie talkie from Cosme.  Gamble's twenty-five (25) year sentence on Count Three runs concurrent to the twenty-five (25) year sentences he received on his other first degree robbery convictions.  Count Fourteen—for which Gamble received a one (1) year sentence that ran concurrent to all of his other, lengthier, sentences— charged Gamble with possession of burglar's tools based on his possession of the sledgehammer.  The jury was instructed, for all counts, that Gamble could be found guilty under accessorial liability and aiding and abetting.  (Tr. 812–13, 841–42.)

Even if the actual walkie talkie and the sledgehammer had been suppressed or excluded, there is still not a reasonable probability that the jury would have reached a different verdict on these charges.  There was overwhelming video and testimonial evidence that the robbers stole Cosme's walkie talkie and that Gamble was criminally responsible for this theft.  (See Tr. 284; Tr. 305, 316–17.)  Similarly, there was overwhelming video and testimonial evidence that the robbers used a sledgehammer during the robbery.  (See Tr. 307–08, 362.)  And, even if the sledgehammer itself was not admitted (or the DNA evidence collected from the sledgehammer was not admitted), the prosecution could have still admitted the picture of the sledgehammer that Detective Cronin took before the alleged break in the chain of custody and purported unlawful search.  There was not a reasonable probability that Gamble would have been acquitted of either of these counts.

the commission of the offense or upon some other occasion relevant to the case, to be given by a

witness who has previously identified him or her or a pictorial, photographic, electronic, filmed or

video recorded reproduction of him or her as such." N.Y. CPL § 710.30(1) (emphasis added).

Petitioner's arguments concerning Officers Alter and Mitchell fail because these officers did not

testify that they identified Petitioner in any way prior to trial. Rather, Officers Alter and Mitchell

simply made in-court identifications of Gamble, (Tr. 445, 700). See People v. Gilmore, 200

A.D.3d 1184, 157 N.Y.S.3d 617, 624 (App. Div. 3d Dep't 2021) ("[officer's] in-court

identification – which was not the product of a police-arranged identification procedure – did not

implicate the statutory notice requirements set forth in CPL 710.30(1)(b)"), leave to appeal denied,

38 N.Y.3d 927 (2022), and leave to appeal denied sub nom. People v. Copo, 38 N.Y.3d 926, 184

N.E.3d 846 (2022).

While there was testimony at trial that Officer Cancel made a pretrial identification of

Gamble, notice under N.Y. CPL § 710.30 was not required given the circumstances under which

this identification was made. Officer Alter testified that, during the officers' pursuit of Gamble on

the golf course, Officer Cancel told Officer Alter, "that's one of the guys, that's one of them." (Tr.

444.) N.Y. CPL § 710.30 was a "legislative response to the problem of suggestive and misleading

pretrial identification procedures." People v. Gissendanner, 48 N.Y.2d 543, 552, 423 N.Y.S.2d

893, 399 N.E. 924 (1979). N.Y. CPL § 710.30 applies to identifications that result from "[s]tate-

prompted identification procedures, such as street showups made at the behest of the police," but

not to identifications that result from "spontaneous and unplanned encounters." People v. Newball,

76 N.Y.2d 587, 591, 563 N.E.2d 269 (1990). Here, Officer Cancel identified Gamble while he

and Officer Alter were searching for the fleeing robbers on the golf course. As this was a

"spontaneous and unplanned encounter[]," notice under N.Y. CPL § 710.30 was not required.

Accordingly, trial counsel did not act unreasonably in not seeking preclusion of Officer Cancel's identification testimony based on an alleged violation of CPL § 710.30.

Moreover, even assuming for the sake of argument that trial counsel could have established "a section 710.30 violation, it might not have resulted in exclusion of the evidence in question." People v. Vasquez, 20 N.Y.3d 461, 467, 985 N.E.2d 899, 902 (2013). "CPL 710.30(2) provides for the possibility of late notice, and a belated suppression hearing, when the People show 'good cause.'" Id. "The belated notice and hearing may occur during the trial, and if the trial court thought the People had made an excusable error it might have granted such a remedy here." Id. (internal citation omitted). Here, any error by the prosecution in not providing notice would likely have been excused by the trial court given the circumstances.

Finally, even assuming arguendo that trial counsel would have been successful in excluding Officer Cancel's identification testimony, there is not a reasonable probability that the verdict would have been different. Officer Cancel's "identification" testimony was an extremely minor piece of the prosecution's case. As explained in the discussion of Gamble's claim concerning the evidence from the Escalade, the evidence against him was overwhelming. Accordingly, any ineffective assistance claims premised on CPL § 710.30(2) is meritless.

The state court's denial of these ineffective assistance claims was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts.

## F. **Failure to Object to an Unsworn Prosecution Witness and Unsworn Jurors**

Petitioner alleges that trial counsel was ineffective for failing to object to the unsworn testimony of a prosecution witness and to a verdict rendered by allegedly unsworn jurors. (Pet. at 6–7.) Because these claims are meritless, appellate counsel was not ineffective for failing to argue

ineffective assistance of trial counsel on appeal.

### 1.  Unsworn Testimony of Prosecution Witness Wilson Cosme

Petitioner first alleges that prosecution witness Wilson Cosme, the London Jewelers'
Director of Security, provided unsworn testimony at trial, and that appellate counsel erred by not
arguing on appeal that trial counsel was ineffective for failing to object to Cosme's purportedly
unsworn testimony.

At the close of defense counsel's opening statement, the prosecution called Cosme to the
stand.  The trial transcript states that the following exchange occurred:

THE CLERK:  State your name, spelling your last name.

THE WITNESS:  Wilson Cosme, C-O-S-M-E.

THE CLERK:  County of Residence.

THE WITNESS:  Nassau.

THE COURT: Ladies and gentlemen, by way of some recapitulation, a witness took
the stand, he was placed under oath by our clerk, Charles Elmore.
Mr. Elmore asked him questions about his identity and where he
lives. He gave those answers under oath. That is the first piece of
evidence this case.

(Tr. 280.)

Although the court reporter did not indicate in the transcript that Cosme was sworn,
Gamble, that omission alone is, given all the circumstances here, insufficient to establish that
Cosme was not sworn.

Habeas courts are required to adopt a "strong presumption of constitutional regularity in
state judicial proceedings."  Darr v. Burford, 339 U.S. 200, 218 (1950).  "A habeas court will
presume 'regularity' in the conduct of the trial, absent substantial contrary evidence."  Benitez v.
Senkowski, No. 97-CV-7819, 1998 WL 668079, at *8 (S.D.N.Y. Sept. 17, 1998); see also Theard

v. Artus, No. 09-CV-5702, 2012 WL 4756070, at *13 n.17 (E.D.N.Y. Aug. 27, 2012) ("[I]f there is any doubt as to whether the oath was correctly administered, there is a 'strong presumption of constitutional regularity in state judicial proceedings.'") (quoting Darr, 339 U.S. at 218).

In a habeas proceeding, the fact that a trial transcript does not state that an oath was administered is, without more, insufficient to rebut the presumption of regularity.  See Mena v. Heath, No. 11-CV-3681, 2016 WL 7767005, at *13 (S.D.N.Y. May 31, 2016) (holding that the trial transcript's failure to indicate that a testifying witness was "duly sworn," without more, was insufficient to meet the petitioner's "substantial evidentiary burden" to overcome the presumption of regularity), report and recommendation adopted, 2017 WL 167915 (S.D.N.Y. Jan. 13, 2017).

New York law recognizes a similar presumption of regularity.  See People v. Bicet, 180 A.D.2d 692, 693, 580 N.Y.S.2d 55 (App. Div. 2d Dep't 1992) (finding that presumption of regularity applied where defendant asserted that interpreter was not sworn).

Although the court reporter did not explicitly indicate in the transcript that Cosme was sworn, the transcript itself belies Gamble's claim as the judge recounted the fact that Cosme had, in fact, been placed under oath.  Moreover, although Gamble was himself present during the trial, the record does not contain an affidavit from Gamble explicitly attesting that he recalls that Cosme was, in fact, not sworn.  Nor does the record contain any affidavits from Cosme, defense counsel, or any other trial participants on this point.  Gamble's claim fails given:  (1) the trial judge's statement above indicating that the clerk of the court did, in fact, administer the oath to Cosme; (2) the presumption of regularity in state court proceedings; and (3) Gamble's lack of substantial

contrary evidence indicating that Cosme was not duly sworn.[11]

Additionally, the fact that New York law recognizes a similar presumption of regularity was a further reason why it was reasonable for appellate counsel not to pursue this argument on appeal.

Even assuming arguendo that Cosme was, in fact, not sworn, Petitioner failed to demonstrate that trial counsel's failure to object to the allegedly unsworn testimony fell below an objective standard of reasonableness. Trial counsel could have concluded that objecting and insisting that the oath be administered to Cosme would have only "heighten[d] the jurors' belief in the truthfulness of [his] testimony." See Mena, 2016 WL 7767005, at *14; see also Cohen, 427 F.3d at 170 ("[D]ecisions such as when to object and on what grounds are primarily matters of trial strategy and tactics and thus are virtually unchallengeable absent exceptional grounds for doing so.") (internal quotation marks and citations omitted). Accordingly, failure to raise this argument on appeal does not constitute ineffective assistance of appellate counsel.

Petitioner also fails to establish prejudice. First, even assuming that Cosme was not sworn, there is no reason to believe that Cosme did not testify truthfully at trial or that he would have

---

[11] A close review of the transcript indicates that the court reporter simply failed to include the standard language that the reporter used for other witnesses who were called to testify. For other witnesses, the transcript includes a standard notation at the outset of the witness's testimony. As an example, for witnesses Robert Weber and Konstantinos Anastasis, the transcript states, at the beginning of their testimony:

> ROBERT WEBER, called on behalf of the People, having been duly sworn, took the witness stand and testified as follows:
>
> ****
>
> KONSTANTINOS ANASTASIS, Police Officer, called on behalf of the People, having been duly sworn, took the witness stand and testified as follows:

(Tr. 320, 334). By contrast, this boilerplate language, which also notes which party called the witness and the fact that the witness took the stand and testified is simply missing from the portion of the transcript concerning Cosme. This was obviously an oversight by the reporter, and there is certainly not—given all the circumstances here— substantial evidence that Cosme was not sworn.

testified differently if given the oath.  Cosme was in London Jewelers on the day of the robbery and witnessed it firsthand.  (Tr. 284–85.)  Cosme testified, inter alia, that at approximately 1:50 p.m. on October 14, 2011, robbers entered London Jewelers, pointed a silver handgun in his face and ordered him to "get down," smashed glass display cases, and exited the store moments later. (Tr. 283–84.)  On the stand, Cosme did not identify Gamble as a perpetrator given that the robbers all wore masks during the robbery.  Cosme spent most of his testimony viewing video and photographic evidence and recounting events from the robbery that were also apparent from the video and photographic evidence.  (Tr. 303–317.)  Cosme's testimony about the robbery was corroborated by both video from the store and the eyewitness testimony of several other witnesses, including other employees of London Jewelers and a customer who was also present during the robbery.  (Tr. 320–323, 359–362, 488–89, 589–90.)

Second, even if Cosme's testimony should have been excluded, there still would have been overwhelming evidence of Petitioner's guilt.  In light of the evidence at trial, including the video evidence and the testimony of several witnesses confirming Cosme's description of the robbery, Petitioner cannot demonstrate prejudice.  Accordingly, appellate counsel's failure to cite trial counsel for ineffective assistance on this basis does not provide a ground for habeas relief.

### 2.  Verdict Rendered by Unsworn Jurors

Next, Petitioner alleges that the verdict was rendered by unsworn jurors, and that appellate counsel erred by failing to argue on appeal that trial counsel was ineffective for not objecting to a verdict rendered by unsworn jurors.

Petitioner contends that juror twelve and three alternate jurors were not sworn.  (Pet. at 10; Petitioner's 2254 Reply Br. at 32.)  The trial transcript reflects that two groups of five jurors were sworn, followed by the eleventh juror being separately sworn.  (Tr. 84–85, 89, 144–45, 226).

Although the trial record does not explicitly indicate that the twelfth juror or the three alternate jurors were sworn, (Tr. 242), habeas courts are required to adopt a "strong presumption of constitutional regularity in state judicial proceedings[.]" <u>Darr</u>, 339 U.S. at 218.  Petitioner has failed to produce the contrary substantial evidence necessary to overcome this presumption of regularity.  <u>See</u> <u>Mena</u>, 2016 WL 7767005, at *13.  Moreover, as with the claim concerning Cosme, although Gamble was himself present during the trial, the record does not contain an affidavit from Gamble explicitly attesting that he recalls that these jurors were, in fact, not sworn.  Nor does the record contain any affidavits from defense counsel or any other trial participants on this point.

There is also ample other evidence in the record that further supports the presumption that the jury was sworn.  The clerk of the court repeatedly announced the presence of "all sworn jurors." (Tr. 303, 358, 550, 585, 624, 653, 694, 713, 752, 778, 841, 857, 862.)  In his opening statement, the prosecutor stated that he had "heard the clerk swear you in just before" and referenced the oath that the jurors took to "try this case in a just and impartial manner."  (Tr. 275.)  Defense counsel also stated, during summation, that the jurors took an oath "to hold this case to the standard the judge gives [them]."  (Tr. 92:7–8.)  Additionally, prior to opening statements, the court instructed the jury:

> [W]hen I instruct you on the law, either during or at the close of the trial, you must follow my instructions on the law exactly as I give them to you without any hesitation or reservation.
>
> ****
>
> You must keep an open mind throughout the trial.  You must reach your conclusion and ultimate decision only after having heard all of the evidence and my instructions to you on the law, and then only after exchanging views and reasoning together with other members of the jury during your final deliberations.

(Tr. 248, 250.)  And, in the jury charge, the court told the jury that they must "decide this case solely upon the evidence and render a fair and impartial verdict."  (Tr. 802; <u>see</u> <u>also</u> 801:1–6.)

36

Petitioner offers no reason to suspect that the jurors departed from these instructions, and courts presume that jurors complied with the court's instructions. Penry v. Johnson, 532 U.S. 782, 799 (2001) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)); cf. Pinkney v. Senkowski, No. 03-CV-4820, 2006 WL 3208595, at *6 (S.D.N.Y. Nov. 3, 2006) (rejecting claim based on allegedly unsworn jurors and stressing the instructions given by the court).

Because of the ample evidence in the record indicating that the jury was sworn, appellate counsel acted reasonably when he did not pursue an ineffective assistance claim based on the alleged unsworn jurors. Furthermore, it was also reasonable for appellate counsel not to pursue this claim on appeal given the presumption of regularity recognized by New York law. For all of these reasons, Gamble's claim fails.

Moreover, even assuming arguendo that the twelfth juror who ended up deliberating was unsworn, Gamble cannot establish prejudice as he "does not allege, much less show, that [the] unsworn juror somehow affected the outcome of his trial as a result of being unsworn." Brown v. Carter, No. 17-CV-243, 2019 WL 7821530, at *9 (M.D. Ala. Dec. 20, 2019), report and recommendation adopted, 2020 WL 525931 (M.D. Ala. Jan. 31, 2020).

For these reasons, the state court's denial Petitioner's ineffective assistance of appellate counsel claim based on the allegedly unsworn witnesses and jurors was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable application of the facts.

**G. Claim that Appellate Counsel Was Ineffective Because He Advised Gamble to Submit His Ineffective Assistance of Trial Counsel Claims in a § 440.10 Motion Rather Than on Direct Appeal**

Gamble asserts that appellate counsel erroneously advised him to submit his claims that trial counsel was ineffective in a N.Y. CPL § 440.10(1) motion to set aside the verdict instead of

on direct appeal, and that this caused the default of the claim.  (Pet. at 6.)  In addition to being

unexhausted, this claim is meritless.

This argument does not appear in Gamble's coram nobis petition.  Rather, Gamble first

raised this argument in his reply to appellate counsel's response to the coram nobis petition and in

his Leave Application.  (See Aff. in Resp., ECF No. 8-17, at 1–2; Leave Application, at 6–7.)  This

may not have been sufficient to present this argument to the state courts for purposes of exhaustion.

See Rustici v. Phillips, 308 F. App'x 467, 469 (2d Cir. 2009) (raising a claim for the first time in

a reply brief to the Appellate Division and then in application for leave to appeal to Court of

Appeals does not fairly present the claims to state court).  In any event, as explained below, this

claim is substantively meritless and fails on both prongs of Strickland.[12]

As an initial matter, Gamble has not established that appellate counsel actually instructed

or advised him to submit his ineffective assistance of trial counsel claims in his 440 Motion instead

of on a direct appeal.  DeFelice, Gamble's appellate counsel, filed a response to Gamble's coram

nobis application that includes letters that DeFelice sent to Gamble about his appeal and post-

conviction motion.  None of these letters explicitly advise Gamble that he should file his ineffective

assistance of trial claims in a § 440.10 motion rather than in a direct appeal.  In a February 18,

2014 letter to Gamble, DeFelice explains that, on an appeal, he is "limited to the record of any

hearings and trial and issues that are developed therein . . . If there is anything outside of the record,

then that matter could, depending on the facts, be useful in a CPL 440 motion to vacate the

judgment of conviction."  (Feb. 18, 2014 Ltr., ECF No. 8-16.)  At some point between February

---

[12] There is no indication in the record that the state courts did not consider this claim when they summarily denied Gamble's coram nobis petition and his application for leave to appeal.  Because the state courts denied that petition on the merits, Gamble must satisfy AEDPA's deferential standard of review to prevail on this claim.  Gamble cannot meet that standard as the state courts' denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable application of the facts.

2014 and August 6, 2014, Gamble sent DeFelice a copy of his <u>pro</u> <u>se</u> § 440.10 motion.  (<u>See</u> Aug. 6, 2014 Ltr., ECF No. 8-16.)  In a letter dated August 6, 2014, DeFelice informed Gamble that DeFelice had reviewed the 440 Motion drafted by Gamble.  Although DeFelice informed Gamble that he would not be adding those issues to the counseled appellate brief, DeFelice told Gamble that he "did a very nice job" on the motion and he urged Gamble "to file your motion if you wish." (<u>Id.</u>)  None of these letters demonstrate that DeFelice told Gamble to only raise these ineffective assistance claims in a § 440.10 motion and not to include them in a supplemental <u>pro</u> <u>se</u> brief for the direct appeal.

Additionally, even assuming that DeFelice instructed Gamble to file his ineffective assistance of trial counsel claims in a § 440.10 motion rather than on direct appeal, such advice was not objectively unreasonable.  Gamble's 440 Motion raised ineffective assistance of counsel claims and appears to rely on certain evidence that was not introduced at trial.  (<u>See</u>, <u>e.g.</u>, Petitioner's Mem. of Law in Supp. of § 440.10 Mot. at 13–15.)  Although the state court, in denying the 440 Motion, concluded that Gamble failed to demonstrate the existence of pertinent evidence extraneous to the record—and, as such, had to raise these claims on direct appeal—that ruling does not establish that DeFelice's purported advice was objectively unreasonable.  Given the substance of Gamble's 440 Motion and the evidence cited therein, it would not have been objectively unreasonable for counsel to advise Gamble to bring such claims in a § 440.10 motion rather than on direct appeal.

Gamble's claim also fails because he cannot establish prejudice.

First, even assuming <u>arguendo</u> that appellate counsel erroneously instructed Gamble to file his ineffective of assistance of trial counsel claims in a § 440.10 motion instead of on direct appeal, Gamble would have already known that this advice was erroneous when he filed his <u>pro</u> <u>se</u>

supplemental brief with the Appellate Division for his direct appeal. Gamble submitted his 440 Motion to vacate the judgement of conviction on August 10, 2014. Justice Quinn denied that motion on September 24, 2014. Gamble subsequently submitted his pro se supplemental brief to the Appellate Division on May 18, 2015. To the extent that Gamble's 440 Motion was denied on procedural grounds, Gamble was alerted to this deficiency (and the alleged error in appellate counsel's advice) well before he filed his pro se supplemental brief for his direct appeal. Gamble, however, failed to include ineffective assistance of trial counsel claims in his pro se supplemental brief, despite having over seven months' notice that he had incorrectly advanced these arguments in his 440.10 Motion.[13]  Accordingly, Gamble is unable to satisfy the prejudice prong of Strickland.

Second, Gamble's 440 Motion was denied on both procedural grounds and on the merits. As a result, Gamble was not prejudiced by any erroneous advice from appellate counsel because, irrespective of any procedural deficiency in his 440 Motion, the state court also denied Petitioner's claims on the merits.

Third, the ineffective assistance of trial counsel claims that Gamble raised in his 440 Motion are substantively meritless. As such, even if he had raised these ineffective assistance claims on direct appeal, they would have been denied. Gamble's 440 Motion asserted that trial counsel was ineffective for not challenging the evidence recovered from the Escalade by: (1) objecting to its admission on chain of custody grounds; and (2) seeking to suppress the evidence based on the alleged unlawful search. The Court has already addressed the substance of these meritless claims, which fail on both prongs of Strickland. Gamble's 440 Motion also argued that

---

[13] On September 5, 2014, Gamble asked the Appellate Division for permission to file a pro se supplemental brief. This request was filed before denial of his 440 Motion on September 24, 2014. However, the Appellate Division did not grant Gamble permission to file a pro se supplemental brief until December 4, 2014 when it gave him until June 12, 2015 to file a pro se supplemental brief for his direct appeal. Gamble had ample time to include any ineffective assistance of trial claims in his pro se supplemental brief, which was not filed until June 1, 2015. Even assuming that Gamble would have needed to seek further leave from the Appellate Division to raise this claim, nothing prevented him from seeking such leave.

trial counsel was ineffective because he should have used alleged inconsistencies in certain records to argue that—contrary to the testimony of multiple officers—Gamble was, in fact, not in possession of the stolen watch or the sweatshirt jacket when he was arrested.  The manner in which trial counsel addressed the stolen watch and sweatshirt jacket at trial—and challenged the prosecution's case on these issues—were matters of reasonable trial strategy.  Moreover, Gamble cannot show prejudice.  His guilt was also established by, inter alia, the DNA evidence on the ski mask found behind the Escalade as well by his undisputed and unexplained presence on the golf course shortly after the suspects fled the Escalade.  Gamble's 440 Motion also asserted that trial counsel should have requested a missing witness charge concerning the unidentified officers who searched the Escalade.  This claim also fails on both prongs of Strickland.

Finally, Gamble's claim also fails on another ground.  DeFelice's advice primarily concerned Gamble's 440 Motion, which is a post-conviction proceeding.  Gamble cannot establish that the state courts' denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law because it is not clearly established that the type of advice allegedly provided by DeFelice implicates the right to effective assistance of appellate counsel.  Because "[t]here is no Sixth Amendment right to counsel in collateral proceedings, such as post-conviction § 440.10 motions . . . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings."  McFadden v. Keyser, No. 20-CV-0746, 2023 WL 3355204, at *9 (W.D.N.Y. Mar. 28, 2023), report and recommendation adopted by, 2023 WL 3344446 (W.D.N.Y. May 9, 2023).  DeFelice simply:  (1) informed Gamble of the general legal standards for appeals and § 440.10 motions; (2) told him that he did a "very nice job" on his pro se 440 Motion; and urged him to file that motion.  This advice primarily concerned post-conviction proceedings.  A determination by the state courts that such conduct did not violate the right to

effective assistance of appellate counsel—which only extends to a petitioner's direct appeal—would not be contrary to, or involve an unreasonable application of, clearly established federal law.

In conclusion, Gamble's claim that appellate counsel incorrectly urged him to raise an ineffective assistance of trial counsel claim in a § 440.10 motion is meritless.

## H.  Cumulative Effect of Appellate Counsel's Errors

Finally, Gamble claims that the cumulative effect of appellate counsel's errors constitutes ineffective assistance and warrants granting the petition.  (Pet. at 7.)  This claim of cumulative error is meritless.

Gamble's coram nobis petition raised a "cumulative effect" argument based on all the arguments that he raised in his coram nobis petition.  That argument is meritless and the state court's denial of that claim was neither contrary to, nor an unreasonable application of, established federal law, nor was it an unreasonable determination of the facts.

## III.  CONCLUSION

For reasons stated above, the Petition is DENIED.  A certificate of appealability shall not issue because Petitioner has not made a substantial showing that he was denied a constitutional right.  See 28 U.S.C. § 2253(c)(2).  I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purpose of any appeal.  Coppedge v. United States, 369 U.S. 438, 444–45 (1962).  The Clerk of the Court is respectfully directed to mail a copy of this Order to the pro se Petitioner and to close the case.

**SO ORDERED.**

Dated:  May 26, 2023
Central Islip, New York

_____/s/  (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE